[No. B265578. Second Dist., Div. Five. June 7, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
IAN EULIAN, Defendant and Appellant.

**COUNSEL**

John Steinberg for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KRIEGLER, J.—**

## INTRODUCTION

Following a hung jury and mistrial, a second jury convicted defendant and appellant Ian Eulian in count 1 of battery with serious bodily injury (Pen.

Code, § 243, subd. (d)),[1] and in count 2 of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), with a finding that defendant personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)). Defendant was placed on probation for a period of three years on various terms and conditions, including 180 days in county jail.

Defendant contends the judgment should be reversed for the following reasons: (1) the trial court committed prejudicial error by allowing a detective to express opinions that defendant and defendant's mother were lying about the charged incident based on the detective's observation of a video recording of the event; (2) it was prejudicial error to instruct the jury pursuant to CALCRIM No. 3472 (Right to Self-Defense: May Not Be Contrived) because the instruction misstates the law of self-defense as explained in *People v. Ramirez* (2015) 233 Cal.App.4th 940 [183 Cal.Rptr.3d 267] (*Ramirez*); (3) the cumulative effect of the court's ruling on the admissibility of evidence requires reversal; and (4) the prosecutor committed misconduct by intentionally introducing inadmissible opinion testimony after failing to obtain a conviction in the first trial.

We affirm. In the published portion of this opinion, we hold that CALCRIM No. 3472 is a correct statement of law, the instruction was properly given under the facts in this case, and the reasoning of *Ramirez* has no application where the party claiming a right to self-defense did not use deadly force. In the unpublished portion of the opinion we reject defendant's remaining claims of error and prejudice.

## FACTS

The charges in this case stem from an altercation between three residents of the West Adams area of Los Angeles: defendant (a 39-year-old off-duty firefighter for the City of Los Angeles); defendant's 70-year-old mother, Lionetta Fontaine; and 48-year-old Rebecca Stafford. Stafford routinely fed feral cats in the alley behind where defendant and his mother resided in the mother's fourplex building. According to defendant and his mother, the cats created a host of problems, including defecating in the flower beds, dying under their residence, attracting flies, and attacking Fontaine's blind dog.

The parties agree that Stafford was in her Jeep in the alley behind the fourplex, for the purpose of feeding the feral cats, one week before the incident resulting in the charges against defendant. Ronald Richard is another resident of the fourplex owned by Fontaine. A community center is located next to the property. Richard saw Stafford's Jeep and had an interaction with her

---

[1] Statutory references are to the Penal Code, unless otherwise indicated.

regarding the feeding of cats at that location. Defendant arrived, at which point Richard stood inside the doorway of the house.[2]

Defendant told Stafford the cats were defecating in his yard and one had attacked his mother's older dog. According to Stafford, she said she would feed the cats down the alley. Defendant had a different recollection of the interaction, testifying that Stafford yelled and directed profanity toward Richard. Defendant tried to explain the problems caused by the cats, but Stafford yelled at him. Defendant told her to calm down. Stafford's temporary solution was to feed the cats at a location up the alley, but defendant said it would eventually have to stop because that was not a solution to the problems.[3]

Shortly after midnight on September 14, 2013, Stafford again parked her Jeep in the alley behind the fourplex. The community center next to the property had surveillance cameras in the alley, which produced a particularly clear video record of what transpired. There is no audio on the recording. The trial court permitted extensive questioning regarding exactly what was said, what witnesses were thinking, and what the video showed. For purposes of a statement of facts on appeal, it is sufficient to summarize the content of the video, which we have reviewed on multiple occasions, and note the material differences in the testimony of the witnesses at trial.

Stafford testified she was in the alley looking for an injured cat when she heard defendant loudly yelling that he thought he had told her not to feed the cats there again. Stafford told defendant that she was looking for an injured cat to take to the veterinarian. Defendant testified that the argument escalated, with Stafford insisting she could do whatever she wanted and directing profanity at him; defendant responded in kind.

One video recording from the community center cameras depicts Stafford parking her Jeep in the alley. She opened her car door, placed one foot outside, and directed comments at someone who is not yet depicted in the video. Stafford became more animated as she appears to be yelling while gesturing.[4] About one minute into the video, defendant is seen walking quickly toward Stafford's car, pointing at her while appearing to yell.

---

[2] Limitations placed on the scope of Richard's testimony are the subject of one of defendant's appellate contentions, as discussed more fully below in the unpublished portion of this opinion.

[3] Fontaine testified that she had spoken to Stafford about the problem created by the cats nine to 10 times, as far back as 2011. Stafford had been very defensive and not very sympathetic.

[4] Stafford testified she only became angry when defendant said he was just going to kill the cats. Stafford responded with profane name-calling as the incident escalated.

Defendant leaned into Stafford's car, repeatedly poking his finger close to Stafford's face. Stafford and defendant engaged in a heated argument, with each gesturing at different times.[5] As defendant continued to scream at Stafford, she reached to her right and made a throwing motion four times, throwing cat kibble toward defendant. Defendant tried to grab Stafford's arm, but appeared to lose his grip. At about the same moment, Stafford's leg is raised as if to kick or push defendant, and defendant moved backward by one step.

The video then depicts Fontaine walking to the Jeep, where she pulled defendant away by the arm. Fontaine tried to close the door to the Jeep, but Stafford held it open. Fontaine spoke briefly to Stafford, who continued to argue and gesture toward defendant. Defendant moved to the outside of the open car door, yelling and pointing at Stafford. Stafford slapped defendant through the open car window. Fontaine moved forward and traded slaps with Stafford. Defendant moved to a position between the open car door and Stafford, with his mother on his left. Defendant threw two powerful punches at Stafford as she sat in the Jeep, leaping off his feet as he delivered the first blow. Defendant had his left arm on his mother's right shoulder at the time defendant punched at Stafford in the car. At the same moment as the punches, the video shows the movement of Stafford's foot toward Fontaine,[6] who was propelled backward either by a kick from Stafford, a push from defendant's hand on her shoulder, or a combination of the two actions.[7] Defendant forcefully grabbed Stafford and yanked her from the car, threw her to the ground, and delivered two more punches toward Stafford's head. A woman is seen walking into the alley just as defendant is striking Stafford outside of the Jeep. Stafford remained motionless on the ground for approximately two minutes before stirring.

The video depicts Stafford being helped to her feet by defendant and his mother. Stafford testified that she woke up on the ground, bleeding from the back of her head and crying. She was assisted into her vehicle by defendant. Stafford asked what happened. Fontaine said Stafford had tripped, fell, and hit her head on the pavement. Fontaine testified that she gave Stafford that explanation, but she had not actually seen what had happened. Stafford asked defendant if he was sure he did not hit her, which defendant denied, explaining that Stafford was "acting like a crazy woman" and running around her car, hitting and kicking his mother when she tripped, fell, and hit her head on her car.

---

[5] Stafford, defendant, and Fontaine all testified to the prolific use of profanity by Stafford and defendant. The precise language used does not affect the merits of the appeal.

[6] At the preliminary hearing, Stafford testified that after being repeatedly hit by Fontaine she kicked her away. At trial, Stafford denied ever kicking defendant or Fontaine.

[7] Defendant testified that his push did not cause his mother to fall backward.

Fontaine testified that Stafford seemed to have been trying to antagonize defendant. She confirmed trading slaps with Stafford after Stafford slapped defendant in the head through the open car window. Contrary to Stafford's testimony, Fontaine maintained she was kicked very hard in the sternum by Stafford, causing her to fall backward to the ground. Defendant testified that he told Stafford to just leave, and there was nothing to prevent her from doing so, but she remained. Defendant did not simply walk away because the problem with the cats would continue. He had walked 40 feet to get to the Jeep for the purpose of impressing on Stafford the need to leave, and not for the purpose of making physical contact.

Defendant explained in his testimony why he pulled Stafford from the car and punched her. He testified that he kept his composure and was under control during the incident. After Stafford had slapped and kicked defendant and Fontaine, and taking into account the amount of crime in the area, defendant assumed Stafford had a weapon of some sort,[8] so he punched her to protect himself and his mother. He did not hit Stafford after she was subdued. Defendant testified that the punch he threw at Stafford inside the car did not land, and he only connected with one punch.

An anonymous caller to 911 reported that she had heard screaming and walked in the alley and did not get too close. The caller stated that "somebody has jumped on the, the lady and knocked her out. She feeds the cats, next to the school right here now." The lady's head was bleeding, she was knocked out, and was out of her truck. The caller asked the 911 operator to "hurry up, cause she's knocked out her truck is . . . ." When asked if somebody assaulted the lady, the caller replied, "Yes, they have to. Her head is bleeding, she's knocked out. She's out of her truck. . . ." The caller was asked if the lady was breathing. She replied that she could not get close and then described a male who lived next door to the school and a female; they met the description of defendant and his mother. Later in the conversation the caller stated, "But, the keys are in there. I seen that. I walked by you know, but didn't get too close." After further discussion, the caller told the operator, "I heard some screaming and hollering as I was coming towards . . . [coming] east. And I went to see."

Stafford was unable to drive home. She did not recall defendant asking her questions regarding how she felt or examining her, but defendant testified he asked her standard questions to determine her condition based on his firefighter training. After Stafford was assisted into the Jeep, Fontaine drove Stafford home, following directions given by Stafford. Defendant followed in

---

[8] Defendant testified he did not see a weapon before punching Stafford. At another point defendant testified that he punched Stafford because his mother had been kicked.

a separate vehicle. Once parked at Stafford's home, she again asked defendant if he was sure he did not hit her. He again said that she tripped, fell, and hit her head.

A casual acquaintance of Stafford's, saw her sitting in her vehicle at her home, crying with her hands on her face. The acquaintance saw defendant exit from another vehicle; she described defendant as having a nervous look. Stafford awakened her roommate at 3:00 a.m. Stafford was dazed and unsure whether she had been beaten, knocked out, or hit her head on something. The roommate saw that Stafford had marks on her face and a cut on her head. She told him she thought she had been hit but was not sure. Stafford said that people told her she hit her head on the car door, but it did not seem right to her, and she was pretty sure she was knocked out.

Stafford went to the hospital on the evening of September 14, where she was treated and released. She had a black eye, injuries to her left jaw, swelling to the lips and cuts inside her cheek. A physician's assistant testified that if Stafford struck her head and that caused her to pass out, that would be classified as a concussion.

On September 15, 2013, Stafford decided to make a report to the police at the urging of her friends. Stafford told the desk officer that a female and male had expressed their disapproval of her feeding cats at their location, the male approached her vehicle and opened her car door, she really did not know what happened, and at some point lost consciousness. Both suspects told her she fell and hit her face on the driver's door. She came to the police station because her injuries made her think something else had taken place.

Defendant presented four character witnesses, including the mother of defendant's children, a Los Angeles City firefighter paramedic, and two captains with the Los Angeles Fire Department. Each witness expressed the opinion based on years of knowledge that defendant is honest and a non-violent person. Their opinions of defendant's character were not changed by what they saw on the video of the incident.

Called by the defense, Detective Alfredo Reyes testified that he gave both Stafford and Fontaine a fair opportunity to explain what happened. He took notes during his recorded interview of Stafford, which was conducted in a police vehicle outside of her home to avoid the noise from the animals in the home. Stafford told Detective Reyes that defendant and Fontaine told her she had fallen and hit her head.

Detective Reyes telephoned defendant on September 18, 2014, after he had interviewed Stafford and watched the video. He was unable to record the call

because he did not have the adapter for the recording device and it was not his intention to conduct an interview. The purpose of the call was to let defendant know he was conducting an investigation and to confirm defendant's phone number. He asked no questions about the incident. Defendant voluntarily stated there was a confrontation by the art center and Stafford slipped and fell to the ground. The detective knew the video does not show her falling on loose gravel.[9] He took no notes, but immediately input the information from defendant into a follow-up investigation report. Defendant came to the station but declined to be interviewed on the advice of counsel.

Defendant presented a different view of the September 18 call from Detective Reyes. Defendant testified Reyes asked him if there was anything he would like to say. Defendant explained there was an argument, Stafford threw cat food at him, and slapped and kicked defendant and his mother. Stafford ended up on the ground in reaction to her conduct. Defendant did not tell the detective he had punched Stafford because he assumed Detective Reyes wanted to understand what lead up to the punch.

Detective Reyes called defendant the next day to get his mother's phone number. This call was recorded but defendant was not asked questions about the incident. No questions were asked in the recorded conversation because the detective was trying to process a lot of information. Defendant provided his mother's cell phone number as requested.

Detective Reyes called Fontaine at her work at the post office, catching her as she was rushed at the end of the workday, and conducted a recorded interview.[10] The recorded call was played for the jury. Fontaine said there was an argument, fighting and slapping, and she was kicked to the ground. Fontaine suffered a scraped elbow and hit her head on the ground. She saw Stafford getting out of the car and thought Stafford slipped on the gravel while kicking at defendant,[11] who was trying to help Fontaine get up. Stafford ended up on the ground, but Fontaine did not think she was unconscious. Stafford said she was all right but asked what had happened. Fontaine drove Stafford home.

Detective Reyes testified on direct examination that he did not ask Fontaine questions about how she fell to the ground, but she did say Stafford kicked her. When asked if there was any reason he did not ask Fontaine how

---

[9] The trial court admonished the jurors that it was up to them to decide what the video shows.

[10] Fontaine gave inconsistent testimony regarding whether she was aware of the investigation into the incident prior to receiving the call from Detective Reyes.

[11] Fontaine testified at trial that after viewing the video, she was incorrect in her belief that Stafford fell after slipping on gravel.

hard she was kicked, he explained that he ran out of time and he did not believe Fontaine was telling the truth. On cross-examination by the prosecution, the detective testified he had seen the video and believed Fontaine's statement about being kicked was a lie.[12] He already knew defendant hit Stafford, so there was no need to ask questions about that. The stories given to him by defendant and Fontaine were consistent and not truthful. He saw Fontaine propelled backward, but did not see Stafford's leg extended outside the Jeep. He does not believe from the video that Stafford kicked anyone.

## DISCUSSION

*Detective Reyes's Testimony Regarding the Truthfulness of Defendant and Stafford**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Limitation on Self-defense Under CALCRIM No. 3472*

Defendant argues the trial court committed prejudicial error by instructing the jury on self-defense pursuant to CALCRIM No. 3472, because *Ramirez, supra,* 233 Cal.App.4th 940 held that the instruction "misstates the law of self-defense, erroneously preventing the jury from considering a self-defense claim by instructing the jury categorically that a person does not have the right to self defense if he provokes a fight or quarrel with the intent to create an excuse to use force." Defendant also argues there was no factual support for the instruction. We reject the contention because the California Supreme Court has held that the instruction is a correct statement of law; defendant overstates the holding of *Ramirez;* the instruction was proper under the facts of this case; and defendant has not established prejudice.

### Background

The trial court apparently had decided[14] to instruct the jury pursuant to CALCRIM No. 3472, which provides as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent

---

[12] At this point in the testimony, the jury was admonished that it is rare to have a crime videotaped, witnesses might be asked what the video shows, and "ultimately, it's your decision, you get to decide what the video shows. You get to decide what the facts are" and "it's ultimately your decision to decide what the facts are in this case, including what you see or do not see in the videotape." Later in the examination of Detective Reyes the court reiterated to the jurors that is was "for the jury to decide what is shown or not shown on the video."

*See footnote, *ante,* page 1324.

[14] The proposed jury instructions were not discussed on the record.

to create an excuse to use force." Before instructions were read, defense counsel stated, "This was an instruction requested [by the prosecution] over my objection. I think for consistency—the way it reads now is confusing— you probably should add the phrase: to self-defense or defense of another because that's what the defense is in this case." The prosecutor did not object to the modification, and the court made the change suggested by defense counsel. The jury was instructed, "A person does not have the right to self-defense or defense of another if he or she provokes a fight or quarrels with the intent to create an excuse to use force."

### Contrived Self-defense

■ In *People v. Enraca* (2012) 53 Cal.4th 735, 761 [137 Cal.Rptr.3d 117, 269 P.3d 543] (*Enraca*) our Supreme Court explained that the self-defense doctrine "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." In *Enraca*, "the trial court instructed the jury on the law as we have just explained it. It gave CALJIC No. 5.55: 'The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense.' " (Ibid.) While *Enraca* involved the CALJIC analog to CALCRIM No. 3472, the language of the two instructions is materially the same. CALCRIM No. 3472 is therefore generally a correct statement of law. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

*Ramirez, supra,* 233 Cal.App.4th at page 947, acknowledged that "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances. Thus, a victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance. (See, e.g., *Fraguglia v. Sala* (1936) 17 Cal.App.2d 738 [62 P.2d 783].)"

The *Ramirez* court, however, found error in CALCRIM No. 3472 under the facts of that case. There was evidence in *Ramirez* that gang members, including the defendant, sought out a rival gang for the purpose of an assault, but when the defendant believed a rival gang member had a weapon, he responded with deadly force. Over a lengthy dissent by Justice Fybel, the *Ramirez* court concluded that "CALCRIM No. 3472 under the facts before the jury did not accurately state governing law. The blanket rule articulated in CALCRIM No. 3472 and reiterated by the prosecutor effectively told the jury, 'A person does not have [any] right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use [any] force.' In effect, the

prosecutor and the trial court advised the jury that one who provokes a fistfight forfeits the right of self-defense if the adversary resorts to deadly force." (*Ramirez, supra*, 233 Cal.App.4th at p. 947.) Under the facts in *Ramirez*, "the instruction made no allowance for an intent to use only nondeadly force and an adversary's sudden escalation to deadly violence." (*Ramirez, supra*, 233 Cal.App.4th at p. 945.)

*Analysis*

First, the trial court did not err in instructing the jury with the modified version of CALCRIM No. 3472. The instruction is a correct statement of law. (*Enraca, supra*, 53 Cal.4th at p. 761; *Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455.) Although "[t]he instruction misstates the law" according to *Ramirez, supra*, 233 Cal.App.4th at p. 950, we believe the opposite is true. CALCRIM No. 3472 is generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force.

Second, defendant reads far too much into *Ramirez*, which has no application to the facts in this case. The *Ramirez* court was concerned with a defendant's use of deadly force in self-defense. Defendant's claim of self-defense and defense of another in this case was not based on his use of deadly force. On its face, the analysis in *Ramirez* has no application here.

■ Third, defendant's argument that there is no factual predicate for CALCRIM No. 3472 in this case is incorrect. The jury could rationally conclude that defendant provoked the conflict, and that he continued to be the aggressor until Stafford responded, at which point defendant knocked her out with a series of punches. It is undisputed that defendant walked 40 feet to confront Stafford in her Jeep. As defendant screamed and jabbed his finger repeatedly toward Stafford's face, she leaned away, and eventually threw kibble in his direction. Defendant continued to argue with Stafford and gesture toward her, even as his mother tried to pull him away. Assuming defendant is correct that he and his mother were kicked by Stafford, if the jury determined that Stafford did so in response to defendant's aggressive conduct, defendant did not have the right to use force to settle a physical confrontation he arguably created. We do not suggest Stafford was blameless in this incident. It would be generous to say that her conduct left much to be desired. Nonetheless, defendant's conduct did provide a factual predicate for instructing with the modified version of CALCRIM No. 3472.

Fourth, assuming there was error, defendant did not suffer prejudice under either federal or state law. As stated earlier in this opinion, the ultimate issue

was whether defendant used unreasonable force upon Stafford by forcibly removing her from the Jeep and punching her into unconsciousness. If CALCRIM No. 3472 was erroneously given because it was irrelevant under the facts, the error is merely technical and not grounds for reversal. (See *People v. Cross* (2008) 45 Cal.4th 58, 67 [82 Cal.Rptr.3d 373, 190 P.3d 706]; *People v. Rowland* (1992) 4 Cal.4th 238, 282 [14 Cal.Rptr.2d 377, 841 P.2d 897].) Defendant recognizes that during argument to the jury the prosecutor never even mentioned CALCRIM No. 3472, or the principle explained in the instruction. Instead, the prosecutor directed the jury to the ultimate issue on self-defense in this case by arguing it "all really boils down to this one word here, reasonable." The prosecutor explained over the course of five pages in the reporter's transcript why defendant's conduct was unreasonable, including that defendant "went to overkill, an overwhelming amount of violence in response to what he's testified to." We conclude both that the instruction did not improperly affect the verdict, nor is it reasonably probable defendant would have obtained a more favorable result had CALCRIM No. 3472 not be given. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

*Evidentiary Rulings**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Turner, P. J., and Baker, J., concurred.

On June 29, 2016, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 14, 2016, S235770. Corrigan, J., did not participate therein.

---

*See footnote, *ante*, page 1324.